## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN M. NOLAN, JR.** | : | CIVIL ACTION |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **READING BLUE MOUNTAIN &** | : | |
| **NORTHERN RAILROAD COMPANY** | : | |
|     Defendant. | : | NO. 02-CV-2805 (PBT) |

### DECLARATION OF WAYNE G. WEIKEL UNDER 28 U.S.C. § 1746

I, **Wayne G. Weikel**, hereby depose and state as follows:

1.  I make this declaration on my personal knowledge, and I will testify hereto if called as a witness. I am 53 years old and competent to testify.

2.  I worked as Chief Train Dispatcher for Reading Blue Mountain & Northern Railroad Company ("RBMN") from October 1996 to January 2003.

3.  During the time I was employed there, RBMN did perform formal employee performance evaluations on all of its employees.

4.  During the time that we worked at RMBN, I was one of John Nolan's immediate supervisors.

5.  John Nolan was a very good worker for RBMN. He was a good engineer and a good conductor. There were a few really good engineers at RBMN, and John Nolan was one of them.

6.  John Nolan was the kind of guy that you told him what needed to be done, and he got it done.

7. John Nolan was a very intelligent guy and very conscientious. A lot of RBMN employees enjoyed working with John Nolan.

8. John Nolan was as good as anyone else to work the Reading Turn Run. I can think of no one better than John Nolan to work the Reading Turn Run.

9. I never heard any managers or other employees complain about the quality of John Nolan's work at RBMN. I never had any complaints about the quality of John Nolan's work. I never received any negative feedback about John Nolan.

10. To my knowledge, John Nolan never received a negative performance evaluation. He never deserved a negative performance evaluation.

11. Before his discharge, I am almost certain John Nolan never received other disciplinary action.

12. After Tyler Glass became General Manager in mid-2000, there was a fairly big snow storm of approximately 10 or 11 inches. Though quite a few employees did not report to work that day, John Nolan, myself, and a few other employees reported for work at Port Clinton. RBMN's Owner Andrew Muller, Jr. shut the railroad down for the day and sent us home without pay.

13. As Chief Train Dispatcher, I initially was in charge of scheduling all railroad employees. I tried to schedule employees who lived in the Reading Division to work in the Reading Division and employees who lived in the Lehigh Division to work in the Lehigh Division.

14. Prior to Glass becoming General Manager in mid-2000, I scheduled John to work out of Pittston for two consecutive days because we needed extra yard crews to help shift another railroad's cars.

15. Because there was so much work, John worked 12 hour shifts both days in Pittston.

16. Because he had worked and commuted a total of approximately 18 hours the first day, John did not have much time to sleep and get ready for work for the second day.

17. After the second day of working and commuting a total of approximately 18 hours per day, John informed me that he was concerned with falling asleep at the wheel on his drive home if he had to work another 12 hour shift in Pittston.

18. I realized it was crazy to make him work and commute a total of approximately 18 hours. I told John I would do everything I could to keep him working in the Reading Division.

19. John Nolan was hardly ever at Pittston again until Tyler Glass became General Manager.

20. In mid-2000, Defendant replaced its older management team with a new team of younger managers.

21. Prior to the new management team's arrival in mid-2000, I had completed approximately 70 out of the 80 hours on the railroad necessary to qualify as an engineer for RBMN. General Manager Tyler Glass told me not to go out on the railroad to complete the requisite 80 hours. I believe he did not want older employees to be qualified as engineers.

22. When Tyler Glass became General Manager in mid-2000, he took over the duty of scheduling railroad employees.

23. Glass assigned John Nolan to conductor jobs which prevented John from qualifying as an engineer.

24. In mid-2000, John Nolan talked to Tyler Glass about not being scheduled enough hours to qualify for his engineer's license.

25. According to John, Glass made a comment to the effect that John did not have to worry about getting his engineer's license because John did not need the money with the big fat pension check he received from Scott Paper.

26. When John told me this, he was upset and took offense at the remark.

27. Glass usually scheduled employees who lived in the Reading Division to work in the Reading Division and employees who lived in the Lehigh Division to work in the Lehigh Division except when he scheduled John Nolan to work out of Pittston in mid-2000.

28. In mid-2000, Glass scheduled John Nolan to report to Pittston. RBMN did not have any work at Pittston that required John to commute there. Glass just scheduled John to qualify there.

29. Because we did not need John Nolan to work at Pittston, it was obvious to me that Glass was just setting John up to fire him. Glass knew that John would not work at Pittston. He scheduled John to work there in order to give him an excuse to fire him.

30. It takes approximately three hours to drive between Pittston, Pennsylvania and West Chester, Pennsylvania.

31. When I worked for RBMN, my commute from home to work took approximately 30 minutes.

32. At the time he was discharged, John Nolan was RBMN's oldest engineer.

33. At the time that John Nolan was discharged, there were no other engineers over the age of 60.

34. At the time that John Nolan was discharged, I am almost certain there were no engineers over the age of 55.

35. At the time John Nolan was discharged, I can think of only three engineers at RBMN over the age of 40.

36. John Nolan was called "old-timer" by a manager and other RBMN employees.

37. At one time, John Nolan and John Caviston were the two oldest engineers at RBMN. One manager referred to them as "The Viagra Twins".

38. General Manager Tyler Glass knew that John Nolan was called "old-timer".

39. Glass did not disapprove of anyone calling John Nolan "old-timer".

40. Glass did not sanction or warn anyone for calling John Nolan "old-timer".

41. Andrew Muller, Jr., owner of RBMN, made it known that he wanted to get rid of the older railroad employees.

    a. In the Defendant's business office at Port Clinton in approximately 2001 or 2002, I overheard Muller praise younger employees and tell General Manager Tyler Glass and Vice President of Transportation Jim Raffa that he would never hire another experienced railroader because they think like railroaders and not like businessmen.

5

42. Defendant has discharged or forced out several of its employees over the age of 40.

43. Engineer/Conductor John Nolan was fired in approximately mid-2000, at approximately age 62.

44. After John Nolan was fired, Signal Maintainer Thomas Hartman was fired in approximately mid-2001, while approximately in his early 40's.

45. After John Nolan was fired, Assistant Superintendent Joseph Abdo was forced out in approximately mid-2001, while approximately in his early to mid-60's.

46. After Abdo was forced out, Chief Mechanical Officer Ronald Mickalowski was fired in approximately mid-2001, while approximately age 45.

47. After Mickalowski was fired, Engineer/Conductor Stewart Miller was fired in approximately early 2002, while approximately in his mid-40's.

48. After Miller was fired, Maintenance of Way Supervisor John Waters was forced out in approximately early 2002, while approximately age 50.

49. Though I had never received any prior disciplinary action and my evaluation in Fall 2002, ranged between very good and excellent, I was fired by RBMN on or about January 8, 2003, at the age of 50.

_____
**WAYNE G. WEIKEL**

I declare under penalty of perjury that the foregoing is true and correct. Executed on _____, 2003.

Case 2:02-cv-02805-PBT    Document 20    Filed 08/05/2003    Page 7 of 8

## **CERTIFICATE OF SERVICE**

I, John M. LaRosa, do hereby certify, on this ___th day of August, 2003, I caused two (2) copies of **DECLARATION OF WAYNE G. WEIKEL UNDER 28 U.S.C. § 1746** to be sent via fax and first class U.S. mail, postage prepaid to the following:

>Robert G. Devine, Esquire
>Michael W. Horner, Esquire
>White and Williams LLP
>1800 One Liberty Place
>Philadelphia, PA 19103

>Paul R. Ober, Esquire
>Paul R. Ober & Associates
>234 North 6th Street
>Reading, PA 19601

**LAW OFFICE OF JOHN M. LaROSA**

_____
**JOHN M. LaROSA**
Pa. S.C. No. 85339
Two East 7th Street, Suite 302
Wilmington, Delaware 19801
(302) 888-1290

Attorney for Plaintiff John M. Nolan, Jr.

cc:   Thomas Stephen Neuberger, Esquire
      Mr. John M. Nolan, Jr.

Attorney Files/John's Files/Client Files/JLR Clients/Nolan/Pleadings/Declaration of Wayne G. Weikel

i