IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN M. NOLAN, JR. | CIVIL ACTION |
| *Plaintiff* | NO: 02-CV-2805 |
| v. | **NOTICE OF MOTION FOR SUMMARY JUDGMENT** |
| READING BLUE MOUNTAIN AND NORTHERN RAILROAD CO. | |
| *Defendant* | |

TO: John M. LaRosa, Esquire
Thomas S. Neuberger, Esquire
Law Offices of John LaRosa
Two East 7th Street - Suite 302
Wilmington, DE 19801

Ralph E. Lamar, IV, Esquire
141 Spruce Lane
Collegeville, PA 19426

**PLEASE TAKE NOTICE** that defendant, Reading Blue Mountain and Northern Railroad Company moves pursuant to Fed. R. Civ. P. 56 for summary judgment on plaintiff's entire complaint. In accordance with local rules any brief or answer in opposition must be filed and served within fourteen (14) days of filing. Support for this motion is provided in the Memorandum of Law and Exhibits attached hereto.

-2-

                    WHITE AND WILLIAMS LLP

BY: _____
     Robert G. Devine
     Michael W. Horner
     1800 One Liberty Place
     Philadelphia, PA 19103
     Attorneys for Defendant,
     Reading Blue Mountain &
     Northern Railroad Co.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN M. NOLAN, JR. | : | |
| | : | CIVIL ACTION |
| *Plaintiff* | : | NO: 02-CV-2805 |
| | : | |
| v. | : | MEMORANDUM OF LAW |
| | : | IN SUPPORT OF DEFENDANT'S |
| READING BLUE MOUNTAIN AND | : | MOTION FOR SUMMARY |
| NORTHERN RAILROAD CO. | : | JUDGMENT |
| | : | |
| *Defendant* | : | |

## FACTUAL BACKGROUND

Plaintiff, John Nolan, Jr., brings two counts against defendant, Reading Blue Mountain and Northern Railroad ("railroad") alleging that defendant unlawfully terminated his employment due to his age. Count I is brought under the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 1621 et seq. and Count II is based upon the analogous provision of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 953 et seq. Both claims rest upon the allegation that defendant's reason for firing plaintiff is a pretext for age discrimination. Plaintiff seeks the following forms of damages: backpay, frontpay, loss of railroad retirement benefits, loss of social security benefits, statutory liquidated damages, punitive damages, and attorneys' fees.

On August 2, 2000 defendant terminated plaintiff's employment due to his failure to appear for an assignment out of the railroad's Pittston, Pennsylvania station on August 1, 2000. Plaintiff's termination was communicated by the railroad's General Manager, Tyler Glass, at a meeting with plaintiff and Human Resources Director, Tina Muller, on August 2, 2000 and confirmed by way of letter. There is no dispute that the stated reason for plaintiff's termination was his failure to report for his Pittston assignment. Rather, plaintiff claims that the stated

reason for his termination was a pretext and the real reason he was terminated was due to his age. Plaintiff further claims that his assignment to Pittston amounted to a constructive discharge due to the lengthy commute. However, plaintiff had been only temporarily assigned to the Pittston second shift in order to learn it and become qualified on it, so the railroad could have plaintiff available as a qualified engineer on the site for future business needs. At the time of his termination plaintiff was 62 years-old.

Plaintiff worked for the railroad from April 1, 1986 until his termination. From April 1, 1986 to June 14, 1986, plaintiff was a volunteer part-time brakeman on the passenger service. On June 15, 1986, plaintiff became a conductor with the passenger service. He remained in this position until March 16, 1997. On March 17, 1997, at the age of 58, plaintiff became a full-time conductor on the freight service. He was issued his locomotive engineer certificate on April 3, 1997 when he began training to become an engineer. Plaintiff was issued his engineer's license on February 12, 1999 at the completion of his training. He remained in the position of full-time engineer up until the time of his termination.

The railroad has a well-established and well-known policy of qualifying its engineers. Engineers must be qualified to work on a particular run on the railroad before they can be assigned as the primary engineer on that run. During his tenure as a full-time engineer, plaintiff was qualified as an engineer on virtually every run within the railroad's two divisions known as Reading and Lehigh. In fact, plaintiff took pride in his versatility throughout the railroad and actively sought to be qualified throughout.

The railroad also has a well-established and well-known policy with regard to assigning engineers. Although engineers were often qualified on several runs at different stations throughout the railroad, they typically worked out of a few of those stations. Engineers were

required, however, to periodically, temporarily work out of stations different from their standard stations due to illness, vacations, business needs and the like. Plaintiff worked primarily out of the Port Clinton station as well as, to a lesser extent, the Tamaqua, Jim Thorpe and Mauch Chunk stations during his tenure as a full-time engineer. Although plaintiff was primarily stationed out of the Reading Division, he was also qualified as an engineer in the Lehigh Division on all runs except for the second shift at Pittston and therefore was subject to assignment at those other locations if the need presented.

Prior to his termination, plaintiff was assigned to work out of the Pittston station on two occasions: February 18, 1999 (a week after receiving his engineer's license) and April 6, 1999. He worked nine and a half (9½) hours during the February assignment and eight (8) hours during the April assignment. (John Nolan Schedule of Duty, 1997-2000), attached as Exhibit "A." After the April 1999 assignment, the general manager of the Lehigh Division, Joe Abdo, became displeased with plaintiff and he was no longer assigned to the Lehigh Division. Mr. Abdo retired from the railroad in early 2000 and plaintiff admittedly was again subject to assignment in Pittston.

Plaintiff was next assigned to Pittston for the second shift on August 1, 2000. This was a temporary assignment to qualify plaintiff on that particular run. General Manager, Tyler Glass, made this assignment due to a legitimate business need. The railroad was in the process of negotiating with Proctor and Gamble for work which would, and eventually did, increase the railroad's activities in the Lehigh Division, including runs out of Pittston. (Supplemental Interrogatories; documents referencing railroads business opportunities with Proctor and Gamble, November 1999 to March 2001; Summary of Starts for Lehigh and Reading Divisions, 2002 to 2003), attached as Exhibit "B." Qualifying plaintiff on both Pittston shifts would have

provided the Railroad with the flexibility of assigning plaintiff to any run in the Lehigh Divison once the activity increased as expected. Although there were no plans to permanently assign plaintiff to a Lehigh Division station, with the anticipated increased activity, the railroad desired the flexibility to assign plaintiff throughout the entire Lehigh Division on a temporary basis if need be.

During his tenure as a full-time engineer, plaintiff's only written reprimand occurred on December 29, 1999 due to an accident on December 23 in the Tamaqua yard, which resulted in a NORAC Rule 956 violation movement of an engine through an improperly lined switch causing damage to the switch. No formal written performance evaluations were done with respect to plaintiff during his tenure as a full-time engineer.

## ARGUMENT

### I.     General Principles Regarding Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedures states the test for a Motion for Summary Judgment as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is <u>no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law</u>.

[Emphasis added.]

The party moving for summary judgment has the initial burden of identifying evidence, which it believes demonstrates the absence of a genuine issue of material fact. <u>Celotex v. Catrett</u>, 477 <u>U.S.</u> 317, 324, 106 <u>S. Ct.</u> 2548, 2553 (1986). As the Supreme Court noted in <u>Anderson v. Liberty Lobby, Inc.</u>, 477 <u>U.S.</u> 242, 106 <u>S. Ct.</u> 2505, 2510 (1986):

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

[Id. at 477 U.S. at 248, 106 S. Ct. at 2510.]

However, where the nonmoving party bears the burden of proof, it must by affidavits or by the depositions or admissions on file "make a showing sufficient to establish the existence of [every] element essential to that party's case". Ibid.; Childers v. Joseph, 842 F.2d 689, 694 (3d Cir. 1988); Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp., 812 F.2d 141, 144 (3d Cir. 1987). The party opposing summary judgment "must do more than show there is some metaphysical doubt as to the material facts." Matsushita v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Federal Rule of Civil Procedure 56 provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations and denials of his pleadings, but must set forth specific facts showing there is a genuine issue for trial. Anderson, supra, 477 U.S. at 256, 106 S. Ct. at 2511. As the Supreme Court observed in Celotex, supra, 477 U.S. at 322-23, 106 S. Ct. at 2552:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, an on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue of material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders other facts immaterial.

[Ibid.]

It is well established that if a party can show that there is no genuine issue of material fact, it may move for summary judgment and thereby terminate the litigation against it. The court must grant a motion for summary judgment if the moving party demonstrates a lack of genuine triable issues of material fact. Id. at U.S. at 323, S. Ct. at 2555.

In the case at hand, movants respectfully submit that they are entitled to summary judgment as a matter of law in the action brought against them by plaintiff.

## II. Plaintiff Cannot Support His Claims of Age Discrimination Against Defendant and the Court Should Enter Judgment in Defendant's Favor.

In order to prove age discrimination plaintiff must surpass the three-step analysis used to determine liability. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1824-25 (1973). Under the McDonnell Douglas analysis, plaintiff must first produce evidence sufficient to convince the reasonable factfinder as to all elements of a prima facie case. Second, upon showing by the plaintiff of a prima facie case, the burden then shifts to the employer to produce evidence of a legitimate non-discriminatory reason for the discharge. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998) (citations omitted). Plaintiff must then demonstrate that the employer's articulated reason was not the actual reason, but rather, a pretext for the discrimination. Defendant has the burden of production, not persuasion, once plaintiff establishes the prima facie case.

If defendant satisfies its burden of production, the burden shifts back to the plaintiff to offer evidence from which a factfinder could reasonable either (1) disbelieve the employers articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. This burden requires plaintiff to show weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reasons for plaintiff's discharge. Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 235 (3d Cir. 1999) (citations omitted).

### A. Plaintiff's Prima Facie Case

In order to demonstrate a prima facie case of age discrimination, plaintiff must establish that (1) he was a member of the protected class, i.e. was 40 years of age or older; (2) plaintiff was discharged; (3) plaintiff was qualified for the job; and (4) plaintiff was replaced by a sufficiently younger person to create an inference of age discrimination. Keller v. Orix Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc) (citations omitted).

Defendant will assume, for purposes of this motion only, that plaintiff is capable of demonstrating a prima facie case of age discrimination. In particular, he was a member of the protected class in that he was over 40 years of age or older when he was discharged; he was discharged; he was qualified for his job as an engineer; and he was replaced by sufficiently younger persons to create an inference of discrimination.

### B. Legitimate Non-Discriminatory Reason for Plaintiff's Discharge

Assuming arguendo, that plaintiff can carry forth his burden of production and establish a prima facie case of age discrimination, it becomes defendant's burden to establish a non-discriminatory reason for the discharge. In the present case, defendant's legitimate non-discriminatory reason for plaintiff's discharge was that plaintiff did not report for an assigned shift on August 1, 2000. The railroad's employment policy notified its employees of the possibility of immediate dismissal in the event an employee refused to comply with work assignments or instructions. (Railroad's Immediate Dismissal Policy), attached as Exhibit "C."

-7-

C.     **Pretext**

Because defendant can affirmatively identify a non-discriminatory reason for plaintiff's termination, it becomes plaintiff's burden to demonstrate that the non-discriminatory reason is mere pretext for age discrimination.

Plaintiff's complaint contains five topical areas which allegedly support his contention that the railroad's legitimate reason for his termination is mere pretext. (Plaintiff's complaint, dated May 7, 2002), attached as Exhibit "D." First, plaintiff claims that he received lower pay than other qualified, but younger employees. In support of this contention plaintiff asserts that for three-weeks in early 1997 when he worked as a full-time freight conductor he received the passenger conductor's pay rate, five dollars less than what he claims he should have been making.[1] (Pl. Tr. at 100:20 to 101:1), attached as Exhibit "E"; (Payroll Status Changes, dated February 1, 1997 and March 17, 1997), attached as Exhibit "F." Plaintiff realized the pay discrepancy after his first pay check and alerted the fact to the then general manager, Al Luedtke, who informed plaintiff that he forgot to submit the proper paper work and that he would correct the situation immediately. (Pl. Tr. at 102:2-13; 106:20-23). When the railroad was alerted the mistake was immediately corrected. Therefore, a reasonable person will not find a correlation between the mistaken three-week pay rate – years before his termination, which was immediately corrected, and age discrimination. Rather, a reasonable person would view the alleged pretext as merely an innocent paperwork mistake.

Second, plaintiff alleges that the railroad delayed his engineer's license in favor of three younger employees. By delaying his license plaintiff claims that the railroad prevented him from

---

[1] Plaintiff testified that he was receiving $6.50 an hour when he should have been receiving $11.50 an hour. However, plaintiff's testimony is inaccurate. According to the Pay Roll Status Changes found in plaintiff's personnel file, he was making $7.50 an hour.

having seniority over the younger employees, which in turn resulted in less favorable assignments, and delay in his higher pay rate as a fully licensed engineer. Plaintiff's assertions are without merit as plaintiff has failed to produce sufficient evidence to sustain a verdict on this point. Plaintiff presents nothing more than his bare allegations.

In order to obtain his engineer's license plaintiff was provided with eight (8) training days in 1997, sixteen (16) in 1998, and concluded his training in 1999 with another eight (8) training days. Of most significance is the fact that plaintiff has failed to produce any evidence establishing how much faster the other employees progressed through their training. Only one engineer, Michael Kolbe, testified directly on the issue. Mr. Kolbe stated that he received his license faster than plaintiff due to his own initiative and efforts. He testified that a majority of his training hours were received while he was working as a conductor with engineers who were willing to train him during their shifts. (Kolbe Tr. at 11:19 to 12:7), attached as Exhibit "G." Had plaintiff been as aggressive and motivated as Mr. Kolbe he too could have received his license earlier. Plaintiff's lack of initiative, therefore, rather than defendant's alleged discrimination that caused plaintiff to obtain his license at a slower pace than others.

Third, plaintiff alleges that his assignment to Pittston was a set-up for his termination. However, plaintiff's deposition testimony does not support this allegation, in fact his testimony shows that he sought to work in the Lehigh Division and worked there on occasion. For example, plaintiff testified that when he was working as a conductor he asked to become qualified on the Lehigh Division runs. (Pl. Tr. at 70:16 to 71:14). Plaintiff also agreed to become qualified as a conductor on the Pittston yard jobs. (Pl. Tr. at 72:24 to 73:14). Moreover, when plaintiff became qualified in the Lehigh Division he understood that purpose of his

qualification was "to have backup employees who could do the work in case there was sickness, vacation." (Pl. Tr. at 74:10-18).

Moreover, plaintiff testified that he had worked out of Pittston before. For example, he worked in the Lehigh Division as a conductor or engineer trainee thirty to forty (30-40) days, with at least one assignment out of Pittston. (Pl. Tr. at 130:6 to 131:18). In particular, plaintiff recalled making four (4) runs from Lehighton to Pittston in order to be qualified as a conductor. (Pl. Tr. at 71:15-20). He specifically stated that he was asked to cover certain Lehigh Division runs because he was qualified to do so. (Pl. Tr. at 131:19-24). Plaintiff also admitted two assignments out of Jim Thorpe in the Lehigh Division in the late winter and early spring of 2000. (Pl. Tr. at 144:3-8; 145:8-9). Further, Wayne Weikel, chief train dispatcher, testified that he personally had scheduled plaintiff to work out of Pittston two days in a row because they were short-handed. (Weikel Tr. at 24:16-22), attached as Exhibit "H."

Plaintiff's allegation also lacks merit because plaintiff has not presented any concrete evidence regarding his assignment being for more than one day, nor did plaintiff attempt to mitigate his circumstances. For example, plaintiff admitted that he did not know how long the assignment was to last. (Pl. Tr. at 151:6-22; 153:21-23). As Mr. Weikel testified, the employee schedules were prepare the evening before the assignments. (Weikel Tr. at 16:3-21). Consequently, plaintiff could not have known whether he would be scheduled beyond the one day. He also admitted to not making any attempts to accommodate his long commute by staying overnight in the area. (Pl. Tr. at 220:3-5).

Furthermore, the railroad has demonstrated a legitimate business need for plaintiff to be qualified on the second shift out of Pittston, the only shift for which he was not admittedly

-10-

qualified in both the Reading and the Lehigh Divisions. There were only four engineers who were qualified in both divisions. (Pl. Tr. at 137:7-10). Because the railroad anticipated growth in the area it would require more engineers to be qualified for runs in the area. See Exhibit "B."

Fourth, plaintiff alleges that from December 1999 until his termination, his starting point and starting time changed several times within the Reading Division and that his hours varied from 35-45 hours per week while those with less seniority were working 50-60 hours per week.

The evidence, however, establishes otherwise. Plaintiff's own testimony contradicts this allegation. For example, in regards to plaintiff's hours, when asked how many hours he worked when he first became a full-time conductor, plaintiff responded 35-55. (Pl. Tr. at 79:11-13). Plaintiff's shifts in the month of July 2000 consistently began at 6:00 p.m. and concluded anywhere from 2:30 a.m. to 4:30 a.m. (Train Crew Hours July 2000 to August 2000), attached as Exhibit "I." Therefore, plaintiff was working anywhere from eight and a half to eleven hours a day. Ibid. He also testified that he had worked longer hours and had been "outlawed" because he worked twelve (12) hours straight. (Pl. Tr. at 14:11-24).

The written evidence also demonstrates that plaintiff received the hours he requested. Plaintiff stated in a memo dated April 19, 1993, that he wished to work no more than forty (40) hours per week. (Reading & Northern Railroad Schedule Work Hours Memo), attached as Exhibt "J." Plaintiff stated again in August 31, 1998, that he would prefer to average 40-50 hours per week and that he was satisfied with the current scheduling procedure which allowed him to maintain qualifications over the whole system. (Memo from Tyler Glass, August 31, 2004), attached as Exhibit "K." Since plaintiff requested his weekly hour range he cannot now claim that the amount of hours provided to him by defendant was a way for defendant to

-11-

discriminate against him. Moreover, plaintiff's range of hours was consistent with that of other railroad employees. See Exhibit "J." Specifically, when compared with other engineers plaintiff's hours are comparable. (Engineer Hours, July 2000 to August 2000), attached as Exhibit "L."

Plaintiff's contention is also contradicted by the testimony of other railroad employees. William Reigle testified that he worked an average of forty to forty-five (40-45) hours per week. (Reigle Tr. at 15:4-5), attached as Exhibit "M." Mr. Reigle was twenty-one when plaintiff was terminated. (Reigle Tr. at 7:17-18). Michael Creedon testified that he worked on an average forty (40) hours per week. (Creedon Tr. at 19:11-12), attached as Exhibit "N."

In regards to plaintiff's work assignment sites, the eight (8) months prior to plaintiff's discharge his work assignment sites were not significantly different than in previous years. Just as in the previous years, the eight months in question saw plaintiff primarily assigned out of Port Clinton but with periodic assignments out of Tamaqua and Jim Thorpe. See Exhibit "A."

Lastly, plaintiff argues that the railroad has heeded the complaints of younger employees not to make long commutes. In particular, he argues that engineers Mike Bischak and Chad Frederickson refused to work out of Port Clinton and the railroad accommodated them. In addition, plaintiff claims that Chris Bost was qualified for the LEPI and Pittston runs in the Lehigh Division but was never assigned to work those stations. He also alleges that Mr. Norman refused to work in Pittston and the railroad accommodated him.

The employees' deposition testimony shows otherwise. For example, Mr. Bischak testified that he made it a condition of his employment with the railroad prior to his hiring that they were not to assign him to work out of Port Clinton since that would require a two hour

-12-

commute each way. Plaintiff was aware of and acknowledged this condition of his employment. (Pl. Tr. at 203:9-18). Consequently, Mr. Bischak was never qualified to work outside the Lehigh Division, his home division, unlike plaintiff who was qualified to work on all locations within both divisions. (Engineer Qualifications as of July 31, 2000), attached as Exhibit "O." Unlike Mr. Bischak, plaintiff never made his assignment location a condition of his employment. Rather, plaintiff made it known that he desired to be qualified throughout the entire railroad -- while working as an conductor he volunteered to become qualified on the Lehigh runs. (Pl. Tr. at 133:9-19).

Mr. Frederickson testified that he had never refused to work out of Port Clinton nor has he ever refused any job requested by the railroad. (Frederickson Tr. at 33:18 to 34:1), attached as Exhibit "P." He did admit that ninety-nine (99) percent of his assignments were out of Pittston but that he has on occasion worked at different locations to fill in for employees on vacations or if he lost a job bid. (Frederickson Tr. at 29:17-22; 30:6-15; 30:19-23). Mr. Bost also testified that he has never refused to work out of Pittston and has never been asked to work out of Pittston. (Bost Tr. at 39:20-23), attached as Exhibit "Q." He also denied that he has never worked out of the LEPI line. (Bost Tr. at 40:8-9). Mr. Norman also denied plaintiff's allegations concerning him at his deposition. He testified that he was never qualified in the Lehigh Division as a conductor or an engineer and therefore never worked within that division. (Norman Tr. at 26:15-19), attached as Exhibit "R." Mr. Norman is a part-time employee and also works as a dispatcher for the railroad. (Norman Tr. at 18:9-10). He specifically denied that he has refused to work out of Pittston since he recalled a two-week assignment out of Pittston in January and February of 1997 as a dispatcher. (Norman Tr. at 23:8-13; 31:8-12).

Because plaintiff presents nothing more than bare allegations of pretext he failed in his burden of proof and persuasion. Therefore, summary judgment should be granted in defendant's favor.

## CONCLUSION

For the reasons expressed herein, movants respectfully request the entry of summary judgment in their favor.

Respectfully,

WHITE AND WILLIAMS LLP

BY: _____
Robert G. Devine
Michael W. Horner
1800 One Liberty Place
Philadelphia, PA 19103
Attorneys for Defendant,
Reading Blue Mountain and
Northern Railroad, Co.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN M. NOLAN, JR. : | |
| : | CIVIL ACTION |
| *Plaintiff* : | NO: 02-CV-2805 |
| : | |
| v. : | |
| : | **ORDER** |
| READING BLUE MOUNTAIN AND : | |
| NORTHERN RAILROAD CO. : | |
| : | |
| *Defendant* : | |

**THIS MATTER** having come before this Court on motions of defendant, Reading Blue Mountain and Northern Railroad Company, by and through its attorneys, White and Williams LLP, and the court having considered the pleadings filed, argument of counsel, if any, and for good cause shown, it is on this _____ day of _____, 2004,

**ORDERED** the motions of Reading Blue Mountain and Northern Railroad Company are hereby granted and all claims against these parties are dismissed with prejudice; it is further

**ORDERED** that a copy of this order shall be served within seven (7) days of receipt.

_____
, U.S.D.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN M. NOLAN, JR.<br><br>*Plaintiff*<br><br>v.<br><br>READING BLUE MOUNTAIN AND<br>NORTHERN RAILROAD CO.<br><br>*Defendant* | : CIVIL ACTION<br>: NO: 02-CV-2805<br>:<br>: **CERTIFICATE OF SERVICE**<br>:<br>:<br>:<br>:<br>: |

I HEREBY CERTIFY that a true and correct copy of the within Notice of Motion, Memorandum of Law, together with accompanying documents, was served via facsimile and Federal Express to:

John M. LaRosa, Esquire
Thomas S. Neuberger, Esquire
Law Offices of John LaRosa
Two East 7th Street - Suite 302
Wilmington, DE 19801

Ralph E. Lamar, IV, Esquire
141 Spruce Lane
Collegeville, PA 19426

and that the originals have been filed electronically and are available for viewing and downloading from the ECF system.

Respectfully,

WHITE AND WILLIAMS LLP

BY: _____
Michael W. Horner
1800 One Liberty Place
Philadelphia, PA 19103
Attorneys for Defendant,
Reading Blue Mountain and
Northern Railroad, Co.

Dated: November 22, 2004

DOCS_NJ 214422v1