IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN M. NOLAN, JR.,         :       CIVIL ACTION
                            :
        Plaintiff          :
                            :
     v.                   :
                            :
READING BLUE MOUNTAIN &    :
NORTHERN RAILROAD COMPANY,  :
                            :
       Defendant.       :      NO. 02-CV-2805 (PBT)

PLAINTIFF'S ANSWERING BRIEF IN RESPONSE TO
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

LAW OFFICE OF JOHN M. LaROSA
JOHN M. LaROSA, ESQUIRE
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707
Pa. S.C. No. 85339
(302) 888-1290
JohnMLaRosa@Earthlink.net

THE NEUBERGER FIRM, P.A.    RALPH E. LAMAR, IV ATTORNEY AT LAW
THOMAS S. NEUBERGER, ESQUIRE  RALPH E. LAMAR, IV, ESQUIRE
Two East Seventh Street, Suite 302    141 Spruce Lane
Wilmington, DE 19801-3707    Collegeville, PA 19426
Delaware Bar No. 243    Pa. S.C. No. 78974
(302) 655-0582    (610) 831-5181
TSN@ NeubergerLaw.com    Ralph.Lamar@Verizon.Net

Dated: December 20, 2004    Attorneys for Plaintiff John M. Nolan, Jr.

## TABLE OF CONTENTS

**NATURE AND STAGE OF THE PROCEEDINGS**..........................................................1

**SUMMARY OF ARGUMENT**...........................................................................................2

**STATEMENT OF FACTS**.................................................................................................2

**I. Parties.**...........................................................................................................................2

**II. Plaintiff's Employment History and Performance Qualifications.** ....................2

     **A. Plaintiff's Dedication and Work Ethics.** ....................................................3

**III. Plaintiff's Prima Facie Case.** ..............................................................................4

**IV. Defendant's Legitimate Non-discriminatory Stated Reason: Insubordination.** ..............4

**V. Prong 1 of <u>Fuentes</u>.** ...........................................................................................5

     **A. Contradictions and Inconsistencies.** .........................................................5

     **1. Younger Engineers Not Assigned Outside of their Division.** ...................5

       **a. Reading Division Engineers Not Assigned to Lehigh Division.**

..............................5 **b. Lehigh Division Engineers Not Assigned to Reading Division.**

..............................6 **2. Younger Employees Not Asked to Commute Long Distances.**

..............................6

     **3. Younger Engineers Who Complained About or
Refused to Make Long Commute Not Fired.** ...........................................7

     **4. The Prior Ban From Lehigh Division for Identical Conduct in 1999.** ...................9

     **B. Implausibilities, Weaknesses, and Incoherencies.** ..................................9

     **1. Safety Reason for Not Requiring the Long Commute.** ..............................9

     **2. Absence of Business Need for Plaintiff to Work in Pittston.** ..................10

**VI. Prong 2 of <u>Fuentes</u>: The Weight of the Evidence Demonstrates Discrimination.** .........11

     **A. Sequence of Events.** ...................................................................................11

     **1. No Immediate Dismissal for Identical Conduct in 1999.** ........................11

     **2. Younger Management Team's Arrival in Mid-2000.** ...............................12

     **3. Training of Younger Replacement in Summer of 2000.** ..........................12

**B.  Contemporaneous Events.**  .......................................................................13

**1.  Assignment to Pittston in Violation of the Ban.**  .......................................13

**2.  Glass Sets Up Plaintiff to be Fired.**  .........................................................13

**3.  Conversation with 24 Year Old Dispatcher.**  .............................................13

**4.  Termination.**  ..............................................................................................14

**C.  Composition of the Workplace.**  ...............................................................14

**D.  Existence of Evaluations and Lack of Prior Employee Criticism.**  ........15

**E.  Comparative Treatment of Similarly Situated Younger Employees.**  .................15

**1.  Higher Pay for Younger Conductors.**  .........................................................15

**2.  Faster Training and Pay Increases for Younger Trainees.**

.....................................16          **3.  More Consistent Assignments and More Hours for**

**Younger Engineers.** .............17

**a.  More Consistent Assignments.**  .................................................................17

**b.  More Hours.**  ................................................................................................17

**F.  Defendant's Age Based Animus.**  ..............................................................17

**1.  Decisionmaker.** .............................................................................................17

**2.  Company-wide.**

.............................................................................................................18

**G.  Violation of Policy:**

**Glass Allows Younger Workers to Direct Ageist Remarks to Plaintiff.** .............19

**STANDARD OF REVIEW**  ...............................................................................20

**ARGUMENT**  .....................................................................................................20

**I.     UNDER PRONGS 1 AND 2 OF FUENTES v. PERSKIE,**
**32 F.3d 759 (3d Cir. 1994), PLAINTIFF HAS SUFFICIENT**
**EVIDENCE OF PRETEXT TO GO TO THE JURY.**  .............................................20

**A.  A Prima Facie Case Has Been Conceded by Defendant.**  ...................20
          **B.  Defendant's Burden.**
..............................................................................21          **C.  Plaintiff's**
**Ultimate Burden.**  .............................................................21          **1.**
**Prong 1 - The Weaknesses, Implausibilities,**

**Inconsistencies, Incoherencies, or Contradictions in Defendant's Case.** ..............23

**2. Prong 2 - The Weight of the Evidence Demonstrates Age is the Reason Plaintiff Was Discharged.** ...........................................23

**II.    DEFENDANT'S UNTIMELY MOTION SHOULD BE DENIED BECAUSE IT VIOLATES THE SCHEDULING ORDER.** ......................................24

**CONCLUSION** ......................................................................................................25

## NATURE AND STAGE OF THE PROCEEDINGS

_____This is a circumstantial evidence case of age discrimination in which Defendant's 28 year old General Manager discharged the 62 year old Plaintiff, John M. Nolan, Jr., after more than fourteen years of service to the company.

The case is scheduled to be placed on the Court's trial list on Monday, March 7, 2004.[1]

_____After all discovery to date,[2] the principal witnesses include:

1.              Wayne Weikel, Defendant's Chief Dispatcher, Weikel at __;

1.              Tyler Glass, Defendant's 28 year old General Manager who discharged Plaintiff, Glass at __;

1.              Daren Geschwindt, Defendant's 24 year old Dispatcher, Geschwindt at ___.

1.              Christopher Bost, a 37 year old Reading Division engineer, Bost at ___;

1.              William Regal, a 22 year old Reading Division engineer, Regal at ___;

1.              Michael Kolbe, a 20 year old Reading Division engineer, Kolbe at ___;

1.              Michael Creedon, a 42 year old Reading Division engineer, Creedon at

[1]Due to plaintiff and defense counsel's scheduling conflicts with other trials in March and April, the parties have asked the Court to place the case on its trial list for Monday, May 9, 2005, or its earliest convenience thereafter.

[2]All depositions and Defendant's written discovery are complete.  Plaintiff served its written discovery within the August 4, 2003 discovery cutoff set by the Court.  On November 22, 2004, Plaintiff filed a Motion to Compel Responses to Requests for Production of Documents and Answers to Interrogatories.  That same day, Defendant filed its pending Motion for Summary Judgment.

___;

1.                    Joseph Norman, a 50 year old Reading Division engineer, Norman at ___;

1.                    Chad Frederickson, a 29 year old Lehigh Division engineer, Frederickson at ___;

1.                    Michael Bischak, a 39 year old Lehigh Division engineer, Bischak at ___; and

2.                    Therman Madeira, Defendant's Senior Vice President, Madeira at ___.

This is Plaintiff's Answering Brief in opposition to Defendant's Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

1.                    Under prongs 1 and 2 of Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994),

Plaintiff

has sufficient evidence of pretext to go to the jury.

1.                    Defendant's Motion should be denied because it violates the Scheduling

Order.

The December 1, *2003* deadline for summary judgment motions set by the Court in its

Scheduling Order of April 11, 2003, expired over eleven months before Defendant's Motion was

filed.  Also, Defendant did not provide a short and concise statement in numbered paragraphs of

material facts to which it contends there is no genuine issue of material fact.

## STATEMENT OF FACTS

**I. Parties.**  Plaintiff John M. Nolan, Jr. is a Pennsylvania citizen residing in West Chester.

Verified Complaint at ¶¶ 1, 1.a and Answer at ¶ 1; B1, 15.  Defendant Reading Blue Mountain &

Northern Railroad Company is a railroad operating in Port Clinton in Berks County.  Id. at ¶¶ 2-

2.b; B1, 15.[3]

_____

[3]In 2000, Defendant was engaged in an industry affecting interstate commerce and had more than 20 employees for each working day in that calendar year.  Pl. 1st Req. for Adm. and Def. Resp. at

¶¶ 2(a), (b); B40, 42.

**II.  Plaintiff's Employment History and Performance Qualifications.**  Plaintiff was employed by Defendant and its predecessors from April 1, 1986, to August 2, 2000.  Pl. at 16; B94.  He first was an unpaid, volunteer, then worked as a brakeman in May of 1986, then became a qualified conductor in June of 1987.  Pl. at 18, 26; B96, 104.[4]  He became a full-time employee on March 17, 1997, an engineer trainee on April 22, 1997, and finally a licensed engineer on February 11, 1999.  V. Complaint at ¶¶ 15, 19 and Answer at ¶ 10, Pl. at 80, 88; B4, 5, 17, 158, 166.

    **A.  Plaintiff's Dedication and Work Ethics.**  Plaintiff was one of the "few really good engineers at [the railroad]." Weikel Decl. at ¶ 5; B34.  The same year he was fired, Plaintiff received monetary awards and commendations for his "dedication [in] reporting to work as scheduled" during the winter storm on January 25, 2000, and for his "good safety performance and concern for th[e] company [on February 29, 2000] ." 33, 34RBM; B794, 795.  Defendant's CEO and Chairman Andrew Muller, Jr. praised Plaintiff's "service and dedication" in 1997, 1998, and 1999.  10, 7, 6a; B789, 790, 791.  Senior Vice President Therman Madeira acknowledged his "positive attitude and good work ethics" in 1997, and his "dedication and loyalty to the company" as early as January 14, 1993.  12, 13a; B787, 788.

---

[4]Senior Vice President Therman Madeira called him his "conductor of choice." Madeira at 16, Pl. at 104; B768, 104.  In that role, Plaintiff never failed to appear for a regularly scheduled workday.  Pl. at 92; B170.

Plaintiff "never argued [if] you g[a]ve him a job to do . . . ." Weikel at 15; B383.  He never turned down a job where he knew Defendant needed somebody to work and always reported to work if it was within his capability to do so.  Pl. at 144; B222.[5]

Even the man who fired Plaintiff, General Manager Tyler Glass, admitted his "work ethic is terrific[.]" 52RBM; B799.

---

[5]In July of 2000, after being subject to road rage and punched by an angry motorist, Plaintiff reported to work with a bruised face.  Pl. at 196; B274.  Despite being the victim of the battery, he has never brought a lawsuit other than this one.  Pl. at 193; accord Pl. Ans. to Interrog. No. 13; B271, 71.

**III.  Plaintiff's Prima Facie Case.**  At the time of his discharge, Plaintiff was 62 years old.  V. Complaint at ¶ 47; B8.  He was qualified to do the job of a licensed engineer.  Pl. at 88, 165; B166, 243.  Defendant discharged him on August 2, 2000.  21a; B793.  He was replaced[6]and worked on the Reading Turn.  V. Complaint at ¶ 40, Geschwindt at 23, 46; B7, 502, 526.  In Summer of 2000, Plaintiff worked with engineer-trainee Jack Barnett on the Reading Turn.  V. Complaint at ¶ 41, Norman at 28; B7, 653.  In July of 2000, Barnett became qualified as an engineer on the Reading Turn.  V. Complaint at ¶ 42; B8.  At the time of and immediately after Plaintiff's discharge, Barnett was the engineer assigned to the Reading Turn and filled the vacancy left by Plaintiff.  V. Complaint at ¶ 60, Geschwindt at 48, 49; B10, 528, 529.

---

[6]From approximately December of 1999 through July of 2000, Plaintiff was assigned to

on the Reading Turn by a substantially younger employee, 32 year old Jack Barnett.  V.

Complaint at ¶¶ 40-42, 60, 62; Geschwindt at 23, 46, 48, 49; Norman at 28; B7-8, 10, 502, 526,

528, 529, 653.[7]

**IV.  Defendant's Legitimate Non-discriminatory Stated Reason: Insubordination.**  The

stated reason for Plaintiff's discharge was that when assigned to Pittston in the Lehigh Division[8]

_____

[7]Specifically, Barnett was born in 1967.  140RBM; B801.  This makes him 30 years younger than Plaintiff.

[8]Defendant has two divisions, Reading and Lehigh.  All engineer assignments originate from a location in one of these two divisions.

in 2000, he refused to report to his assigned work location.  Answer at ¶ 13; Glass at 38; B17,

351.  Defendant's 28 year old General Manager, Tyler Glass, made the decision to fire Plaintiff.

Glass at 40, 42; B353, 355.  He "told [Plaintiff] that he didn't report to work, he didn't do what

was needed,[9] so there was no need for him." Glass at 38; B351.  Importantly, Glass gave him no

other oral or written reason for his discharge.  Glass at 39; B352.

## V.  Prong 1 of <u>Fuentes</u>.

### _____A.  Contradictions and Inconsistencies.

**1.  Younger Engineers Not Assigned Outside of their Division.**  Younger engineers

generally were not asked to work outside of their division. When Weikel was in charge of

scheduling, Defendant's "practice became not to send the Reading [Division engineers] over to

[the Lehigh Division] and vice versa." Weikel at 32; B400.  Glass took over sheduling for a short

time in mid-2000.  Weikel at 12; B380.  Except when he scheduled Plaintiff at Pittston in August

of 2000, "Glass usually scheduled employees who lived in the Reading Division to work in the

Reading Division and employees who lived in the Lehigh Division to work in the Lehigh

Division[.]" Weikel Decl. at ¶ 27; B37; <u>see also</u> Statement of Facts, Part VI.B.3.a, <u>infra</u>.

**a.  Reading Division Engineers Not Assigned to Lehigh Division.**  At least five

engineers have never worked at Pittston in the Lehigh Division: Chris Bost, Joe Norman, Rich

Bader, and Jack Barnett.  Geschwindt at 40-42; B520-22.  Bost, 37, is qualified to work all runs

on the Lehigh Division.  140RBM, Geschwindt at 39; B801, 519.  Pittston is only 80 to 90 miles

from Bost's home, compared with 134 miles from Plaintiff's home.  Bost at 40, Pl. 1st Req. for

Adm. and Def. Resp. at ¶ 2(c), Pl. at 148; B574, 40, 42, 226.  However, Bost has never been

asked to work the Pittston job, in his 17 years with Defendant.  Bost at 39, 41, Pl. 1st Req. for

---

[9]In reality, there was no need for Plaintiff to work at Pittston on the date assigned.  <u>See</u> Weikel at
108; B476, and Statement of Facts, Part V.B.2 <u>infra</u>.

Adm. and Def. Resp. at ¶ 2(g), Pl. Decl. at ¶ 28; B573, 575, 41, 43, 33. Rather, his assignment has been Port Clinton in the Reading Division for the past 8 years. Bost at 31-32; B565-66.

Joe Norman, who is 11 years younger than Plaintiff, has never been asked to work the Pittston job or anywhere else in the Lehigh Division as an engineer or as a conductor. Geschwindt at 40, 35, Norman at 31, 26; B520, 515, 656, 651. Nor has Defendant asked him to become qualified as an engineer for the Lehigh Division, even though it can order him to do so where there's an abundance of employees on the Reading Division and work on the Lehigh Division that needs to be done. Norman at 28, Geschwindt at 37; B653, 517.

Mike Kolbe was 20 years old when Plaintiff was discharged. Kolbe at 7; B605. All of his job assignments originate in the Reading Division. Kolbe at 16-17; B614-15. He has never been asked to work the LEPI job in the Lehigh Division. Kolbe at 21, Pl. at 63; B619, 141.

   **b. Lehigh Division Engineers Not Assigned to Reading Division.** On the other hand, Lehigh Division engineers Mike Bischak and Chad Frederickson were regularly assigned to work the Pittston job. V. Complaint at ¶ 56.a; B9. Bischak works for the Lehigh Division. Bischak at 16; B710. When hired by Defendant, he started in Pittston in the Lehigh Division, and his regular assignment location has not changed. Bischak at 16, 19, 22; B710, 713, 716. Also, Frederickson's regular engineer assignment has been Pittston 99% of the time. Frederickson at 28; B685.

   **2. Younger Employees Not Asked to Commute Long Distances.** Defendant never made Bost, Frederickson, Mike Creedon, Bischak, or Norman commute over two hours to maintain their jobs, Bost at 25; Frederickson at 34; Creedon at 22; Bischak at 31; Norman at 23; B559, 691, 750, 725, 648, nor threaten termination if they did not commute to a certain job. See, e.g., Creedon at 22; B750. None of the younger engineers commuted as far as Plaintiff was expected to commute. The longest commutes from home younger engineers Frederickson, Bost,[10] William Regal, Kolbe,[11]

_____

[10]Bost's current commute is 25 minutes from home. Bost at 40; B574. Defendant has never forced him to commute a long distance, nor threatened to fire him if he didn't work a certain

assignment.  Bost at 40-41; B574-75.

[11]Defendant has not required Kolbe to make a longer commute than his normal commute to Port Clinton to maintain his employment.  Kolbe at 21; B619.  Nor has it threatened to fire him if he did not commute to Pittston, or any other job originating in the Lehigh Division.  Kolbe at 21-22; B619-620.

and Creedon had to make were 1 hour and 50 minutes, 1 hour and 40 minutes, 1 hour and 20 minutes, 45 minutes, and 40 minutes respectively.  Frederickson at 22; Bost at 25-26; Regal at 7; Kolbe at 14; Creedon at 22; B679, 559-560, 585, 612, 750.

None of the younger engineers were expected to work and commute a total of nearly eighteen hours as Plaintiff was expected to do.  The longest day of working and commuting younger engineers Creedon, Kolbe, Bost, and Frederickson have had was twelve hours, fourteen hours, and sixteen hours respectively, Creedon at 16 (12 hours); B744, Kolbe at 14-15, Bost at 27; B612-13, 561 (both 14 hours), Frederickson at 24 (16 hours); B681.

In sum, younger engineers[12] were not asked to commute long distances or work outside of their division.  Those employees who complained about or refused to make a long commute from home were not fired. Defendant's treatment of Plaintiff was **inconsistent** because "everything that . . . happened to [Plaintiff] as the oldest employee [did] not happen[] to younger people." Pl. at 163; B241.

**3.  Younger Engineers Who Complained About or Refused to Make Long Commute Not Fired.**  Younger engineers, who complained about the length of or refused to make long commutes from home were not fired or forced to commute there more than once.  Pl. Decl. at ¶ 25; B32.  Defendant allowed them to accept or remain on assignments with shorter commutes and did not require them to make the longer commutes to maintain employment.  Pl. Decl. at ¶ 25; B32.

---

[12]Even younger managers have very short commutes.  General Manager Tyler Glass has a relatively short 45 minute commute one way.  Glass at 32; B345.  Dispatcher Daren Geschwindt has a 10 minute commute from home.  Geschwindt at 25; B504.

In 1998, Joe Norman refused to work at Pittston, Pl. Decl. at ¶ 29, Pl. Ans. to Interrog. No. 22, Pl. at 148; B33, 75, 226.  He also refused to work the Reading Turn and the Engine Turn from Jim Thorpe to Port Clinton.  Pl. at 177; B255.  Norman did not want to make these commutes because they were too far from home.  Pl. at 180, 181; B258, 259.  However, he was not discharged for refusing to work out of Pittston.  Pl. Decl. at ¶ 29; B33.[13]

---

[13]The fact that Norman was allowed to choose where not to work without repercussion was referred to as the "Norman episode", and the "Norman incident." Pl. at 148; Pl. Ans. to Interrog. No. 25; B226, 76-77.

Mike Bischak was not discharged for refusing to work the Port Clinton job. Pl. Decl. at ¶ 26; B33. He told Defendant he couldn't work there on a regular basis because of the two hour commute. Bischak at 27; B721. Thus, the only time he was assigned to Port Clinton, he complained about the long commute from his home. Bischak at 27; B721. Unlike Plaintiff, no one ever banned him from either division, Bischak at 27; B721, or ever threatened to fire him.[14]

Also, Chad Frederickson requested a different work event and had his schedule changed. Pl. at 176; B254.[15] In 1999, he objected to working at Port Clinton, and his assignment was changed. Pl. at 179; B257. He was not discharged. Pl. Decl. at ¶ 26; B33.

Like these younger enegineers, Plaintiff complained to Geschwindt about the commute to Pittston, the time it took, and the fact that he was concerned about falling asleep at the wheel on the drive home. Geschwindt at 28-29; B507-508. However, Norman, Frederickson, and Bischak were not fired. In fact, no other employee has been discharged for failure to report to work. Pl. at 162; B240. Thus, Defendant's stated reason is **inconsistent** with its treatment of younger engineers.

**4. The Prior Ban From Lehigh Division for Identical Conduct in 1999.** Defendant argues that Plaintiff's refusal to report to Pittston was insubordination that justified his immediate dismissal. See Pl. 1st Interrog. and Def. Resp. at ¶ 19; B50, 55. In addition to being inconsistent with its treatment of younger engineers, see Part 3 supra, this is **inconsistent** with its

---

[14]Also, "when Mr. Glass was an engineer, he was the guy that complained the most whenever he had to go to Pittston." Weikel at 94; B462. Specifically, just "one or two years before" he fired Plaintiff, Glass himself admitted that Pittston was "too far to drive[.]" Id.

[15]At least once a week, an employee had their scheduled work event changed. Pl. at 176; B254.

treatment of Plaintiff in 1999.  Just eighteen months earlier, Defendant merely banned Plaintiff

from the Lehigh Division for the identical conduct for which he was fired.  See Part VI.A.1 infra.

    **B. Implausibilities, Weaknesses, and Incoherencies.**

    **1. Safety Reason for Not Requiring the Long Commute.**  There is a safety

reason which makes the stated reason for discharging Plaintiff **weak** and **implausible**.  Engineer

Bischak admitted it would be unsafe to regularly commute over two hours and then work a

twelve hour shift.  Bischak at 29; B723.  "[O]n a 12 hour shift, it's mandatory to have 10 hours

[of] rest before you can accept an[other] assignment." Bischak at 29; B723.  But "[t]here are

times [an engineer will] be out 12 hours, [and have to commute] another 2 hours back [home],

that's 16 hours.  [Thus, an engineer] would never be rested for the next day's work, [and be able

to] get back on the road and do it again." Bischak at 28; B722.  Thus, it is unsafe to be required

to commute over two hours one way as an engineer.  Bischak at 30-31; B724-25.

    Like Bischak, Plaintiff informed his supervisors that he was unable to safely commute

and work the twelve hour shift for the Pittston job.  Geschwindt at 28; Pl. at 140; B507, 218.

Plaintiff told Weikel "he wasn't getting his proper rest," and he was "afraid [he was] going to fall

asleep at the wheel coming home." Weikel at 96, 25; B464, 393.  In 1999, "after he put in the 12-

hour day [at Pittston] and had to go up [again] the next day[,] Plaintiff told Weikel "this

[commute] is killing me." Weikel at 54, 55, 61; B422, 423, 429.[16]

 Thus, as Bischak complained about his Port Clinton commute, Plaintiff complained about his

---

[16]For this same safety reason, Joe Norman quit his prior engineer job.  Though he only worked an eight hour day with North Shore Railroad, he had an 87 mile commute from home which took two hours to drive.  Norman at 12, 10; B637, 635.  After that commute and working eight to ten hours, he occasionally became tired driving home.  Norman at 14; B639.  After less than two months, he quit because "it was too much commuting." Norman at 14, 10; B639, 635.

commute to Pittston, the time it took, and the fact that he was concerned about falling asleep at the wheel on the drive home. Geschwindt at 28-29, Weikel at 25; B507-508, 393. Though he currently is Manager of Operating Rules, Geschwindt at 9; B488, the then 24 year old Dispatcher Daren Geschwindt ignored Plaintiff's safety concern.

**2. Absence of Business Need for Plaintiff to Work in Pittston.** In August of 2000, there was no extra work in Pittston that required Plaintiff to be scheduled there. Weikel at 104; B472. "There was . . . no need for him to be there. There was no vacancy to fill . . . ." Weikel at 25; B394. Defendant had a full crew up there. Pl. at 161; B239. Obviously, other people were available for assignment to Pittston because the Pittston job ran that day even though Plaintiff did not show up, and Defendant did not have to assign anybody else. Pl. at 170-71; B248-49.

Moreover, Plaintiff "was not [even] assigned to a job[.]" Weikel at 108; B476. Rather, he merely "was scheduled to go [to Pittston] just to qualify [for] a job." Weikel at 25; B393. This **contradicts** Defendant's practice because it "didn't send people . . . to Pittston to qualify to learn the jobs . . . there." Weikel at 30; B398. "So there was no need for [Plaintiff] to go up and qualify." Id. Therefore, any alleged "need" for Plaintiff to work at Pittston is **weak**, **incoherent**, and **implausible**.

**VI. Prong 2 of <u>Fuentes</u>: The Weight of the Evidence Demonstrates Discrimination.**

**A. Sequence of Events.**

**1. No Immediate Dismissal for Identical Conduct in 1999.** Defendant did not dismiss Plaintiff for identical conduct the year before his discharge. In February of 1999, Plaintiff was assigned to work the Pittston job for two consecutive days, Weikel at 24; B392. Pittston is 134 driving miles away from Plaintiff's home in West Chester. Pl. 1st Req. for Adm. and Def. Resp. at ¶ 2(c), Pl. at 148; B40, 42, 226. To commute there took Plaintiff about 2 hours and 45 minutes each way, for a total commute of approximately 5 hours and 30 minutes each day, in addition to his 12 hour shift on the train. Pl. Decl. at ¶ 13; <u>accord</u> Pl. at 148; B31, 226. This constituted approximately 17 hours and 30 minutes in one day. Pl. Decl. at ¶ 13; B31.

Nevertheless in 1999, the dedicated engineer reported to Pittston and worked the

job one day.  Pl. at 130, 148, Weikel at 55; B208, 226, 423.  That "first day [he worked] 12 hours on duty . . . at Pittston." Weikel at 24; B392.  "With a [nearly] three hour drive each way, he had [nearly] an 18 hour day "from the . . . time he le[ft] his house until he g[ot] back to his house . . . ." Id. at 25; B393.  Furthermore, the schedule required him "to be out the next morning at the same time allowing him only five hours for sleep." Id.  So after that first day, Plaintiff informed Chief Dispatcher Wayne Weikel that such a long commute combined with the 12 hour shift was too physically draining to allow him to work safely.  Pl. at 148; Pl. Ans. to Interrog. No. 18; Weikel at 25, 61; B226, 73, 393, 429.

In response, Lehigh Division Assistant General Manager Joe Abdo and Mike Bednar banned him from working all jobs in the Lehigh Division.  Pl. at 140, 147, Geschwindt at 33; B218, 225, 513.  Plaintiff never worked an engineer job in that Division from February 11, 1999 to August 2, 2000.  Pl. at 126; B204.  So the alleged offense that carried a punishment of immediate dismissal in 2000, resulted merely in being banned from a Division eighteen months earlier.  See Geschwindt at 33; B513.

**2.  Younger Management Team's Arrival in Mid-2000.**  "In mid-2000, Defendant replaced its older management team with a new [management] team", Weikel Decl. at ¶ 20; B36, "of all . . . young people in their twenties[.]" See Weikel at 12, 19; B380, 387.  Tyler Glass, then age 27, replaced Al Luedtke as General Manager.  Glass at 4, 11, Weikel at 64, 66; B317, 324, 432, 434.[17]

---

[17]Previously, Al Luedtke was General Manager, and Joe Abdo was Assistant General Manager for the Lehigh Division.  Weikel at 64; B432.  "Abdo was a man with 40 years of railroad experience . . . ." Weikel at 87; B455.  Luedtke was "demoted to the locomotive shop[]" at age 57.  Weikel at 64, 99; B432, 467.

Within a week of becoming General Manager, Glass took over all of the scheduling duties, for "a couple of months . . . ." Weikel at 13, 12; B381, 380.  Then "all of a sudden out of nowhere, [Plaintiff] was fired." Weikel at 19; B387.[18]

**3.  Training of Younger Replacement in Summer of 2000.**  In December of 1999, Plaintiff worked on the Reading Division.  V. Complaint at ¶ 33, <u>accord</u> Creedon at 13, Bischak at 16; B6, 741, 710.  From that time through July of 2000, Plaintiff was assigned to and worked on the Reading Turn.  V. Complaint at ¶ 40, Geschwindt at 23; B7, 502.  In Summer of 2000, Defendant "hired [the] 3[2] year old [Jack Barnett,] and asked [Plaintiff] to train him on the Reading [T]urn." Pl. at 163-64; B241-42.  In July of 2000, Barnett became qualified as an engineer on the Reading Turn. V. Complaint at ¶ 42; B8.  As soon as Plaintiff qualified Barnett, Glass assigned Plaintiff to Pittston.  Pl. at 164; B242.

**B.  Contemporaneous Events.**

**1.  Assignment to Pittston in Violation of the Ban.**  In 2000, Plaintiff was not available for assignments in Pittston because he was banned from the Lehigh Division by Abdo and Bednar.  Pl. at 140; B218.  Everybody in the railroad knew this.  Pl. at 197; B275.  Further, the ban was never rescinded.  Pl. at 147; B225.

**2.  Glass Sets Up Plaintiff to be Fired.**  Moreover, Glass knew that Plaintiff could not commute to Pittston safely.  Pl. at 164, 165; B242, 243.  He "knew that [Plaintiff] would not work at Pittston[, so h]e scheduled [him] to work there in order to give him an excuse to fire him." Weikel Decl. at ¶ 29; B37.  When he saw the schedule, Weikel told Glass, "you know Jack [Nolan] doesn't want to go up there. . . . [Y]ou're putting him on a job that doesn't even exist." Weikel at 26; B394.  In essence, Plaintiff "was being set up [by Glass to be fired]." <u>Id.</u> at 26, 23;

---

[18]In the long run, the scheduling duties "didn't go well for [Glass] and then [those duties] came back on [Chief Dispatcher Wayne Weikel] again." Weikel at 12; B380.

B394, 391.

     **3. Conversation with 24 Year Old Dispatcher.**  On the morning of August 1, 2000, Plaintiff called Dispatcher Geschwindt and reminded him that the commute combined with the twelve hour shift was too physically draining to allow him to work safely without putting himself and the railroad in jeopardy.  Geschwindt at 29, Pl. at 153, 150, 172; B509, 231, 228, 250. Because Geschwindt told him it would be a regular assignment, Plaintiff understood the job would last at least the rest of the week, and possibly forever.  Pl. at 150-52; B228-230.  So Plaintiff told him he needed to talk to Glass because he could not go up there safely.  Pl. at 150; B228.  Geschwindt curtly told him to move closer to the job.  Pl. Ans. to Interrog. No. 19, Geschwindt at 29, Pl. at 172; B73-73, 509, 250.[19]  He told Geschwindt to have Glass call him, but Glass never did.  Pl. at 155; B233.

     **4. Termination.**  Instead, Geschwindt called Plaintiff back and told him to report to Port Clinton and bring all of his railroad property with him, on the morning of August 2, 2000. Weikel at 22, Pl. at 156; B390, 234.  Plaintiff met with Glass and Human Resources Manager Tina Muller, for three minutes.  Pl. at 157, 159; B235, 237.  Glass told him, "Jack, this is the second time you refused to go to Pittston where we need you so we don't need you anymore." Pl. at 159; B237.  Plaintiff was discharged for identical conduct for which he was merely banned the year before.  Geschwindt at 33; B513.

---

[19]Previously on February 18, 1999, when Plaintiff first raised the safety concern of an eighteen hour day, Geschwindt sarcastically told Plaintiff to move closer to the job.  Pl. at 172, Pl. Decl. at ¶ 15, Pl. Ans. to Interrog. No. 19; B31, 250, 73.  However, Geschwindt's remarks are **inconsistent** with the employer's practice because Defendant has never officially asked an employee to re-locate.  Geschwindt at 29; Glass at 35; B509, 348.

**C. Composition of the Workplace.**  At the time of his discharge, the 62 year old Plaintiff was the Railroad's oldest engineer, and its oldest employee in the railroad operating department.  Regal at 16, Creedon at 21, Weikel Decl. at ¶ 32; B594, 749, 38.  In fact, he "might have been [Defendant's] oldest employee." Weikel at 19; B387.  After firing him, Defendant had no remaining engineers over age 51.  Letter from M. Horner to J. LaRosa of 10/29/03, 140RBM; B800-801.  Of its seventeen remaining engineers, four were under 30,[20] five were under 35,[21] ten were under 40,[22] thirteen were under 45,[23] and fifteen of the seventeen were under 50.[24]  <u>See id.</u>

---

[20]They were William Regal, 21; James Masker, 24; and Chad Frederickson, 28.

[21]They were the aforementioned; Shane Frederickson, 31; and Jack Barnett, 32.

[22]They were the aforementioned; Christopher Bost, 37; Alfred Luedtke, 37; John Hartman, 38; and Michael Bischak, 39.

[23]They were the aforementioned; Thomas Hartman, 41; Edward Heck, 41; and Jeffrey Seidel, 44.

[24]They were the aforementioned; Stewart Miller, 46; and Richard Bader, 48.

**D. Existence of Evaluations and Lack of Prior Employee Criticism.** During the time Plaintiff was employed by Defendant, "[e]verybody that's an engineer" [received formal annual performance evaluations]." Norman at 15; <u>accord</u> Pl. Decl. at ¶ 3; Weikel Decl. at ¶ 3; B640, 30, 34. However, Plaintiff never received a negative performance evaluation or unpaid suspension. Pl. Decl. at ¶ 4; Weikel Decl. at ¶ 9; B30, 35.[25]

He received only one written reprimand on December 29, 1999. <u>See</u> 98RBM, Glass at 17-18; B807, 330-31. Other than his termination letter, he received no other written reprimands during the course of his employment with Defendant. Glass at 21; B334.

**E. Comparative Treatment of Similarly Situated Younger Employees.**

---

[25]Though Defendant claims it "did not perform formal employee performance evaluations" during the time Plaintiff was employed there, Answer at ¶ 11; B17, this is **contradicted** by the record. <u>See</u> Regal at 9 (received performance evaluations annually), Norman at 15 (received annual evaluations every year from 1998 to 2003), Creedon at 9-11 (evaluated twice), Kolbe at 8-9; B587, 640, 737-39, 606-607.

**1. Higher Pay for Younger Conductors.** When he was a conductor, Defendant "short-changed" Plaintiff on pay. Pl. at 165; B243. On March 17, 1997, Plaintiff began work in freight service as a conductor and was paid at the passenger rate of $6.50 per hour. Pl. Decl. at ¶ 5; B30. At that time, all train service employees were younger than Plaintiff and initially were paid at the higher freight rate of $11.50 per hour. Id., Pl. Ans. to Interrog. No. 14; B30; 71-72; see, e.g., Regal at 12 and Norman at 19; B590, 644.[26]

---

[26]Other train service employees hired before and after Plaintiff started at higher hourly rates than him. Bost made more than $10 per hour when he started as a conductor in train service, at the age of 23. Bost at 15, 17; B549, 551. Norman started at $10 per hour when hired into train service, on May 20, 1996, and earned $11 per hour by his third day. Norman at 18, 9, 19; B643, 634, 644.

**2. Faster Training and Pay Increases for Younger Trainees.** Defendant allowed younger trainees to complete their engineer training in less than a year time but prolonged Plaintiff's training nearly three years. It took Mike Kolbe, age 20, only 3-4 months to complete his engineer's training and get his license. Kolbe at 10; B608. In 1997, William Regal, age 19, completed his engineer's training in 5 months. Regal at 12; B590. Frederickson began his engineer's training in early 1997, at age 25, and completed it in October of that same year. Frederickson at 18-19; B675-76. The training of younger trainees Chris Bost and Mark Canfield also took less than a year. Bost at 23-24, Regal at 12; B557-58, 590. Unlike his younger counterparts, Plaintiff could not complete his 200 hours as a trainee within a year and had to do it on a "piecemeal basis" that spanned nearly three years. Pl. at 164; B242.[27] As a result of the prolonged training, Plaintiff also got a late start on engineer's pay compared to his younger co-workers. Pl. at 166; B244.

**3. More Consistent Assignments and More Hours for Younger Engineers.**

**a. More Consistent Assignments.** Defendants' engineers are regularly assigned to one station in one division. Bost at 32; Creedon at 18; B566, 746. It keeps them on a regular assignment which remains unchanged if no one is sick or on vacation. Kolbe at 20; Creedon at 19; B618, 747. It is not normal for engineers' hours to be changed very often. Creedon at 20, accord Bischak at 22; B748, 716. Bost's assignment has not changed since July of 1995. Bost at 31-32; B565-66. Bischak has had only 4 different start times in over 6 years with Defendant.

---

[27]On April 22, 1997, Plaintiff received his student license and entered the engineer training program. V. Complaint at ¶ 19 and Answer at ¶ 10; B5, 17. That year, Defendant gave him only eight training sessions. 81RBM, Pl. Decl. at ¶ 9; B802, 31. In 1998, Defendant still did not conclude his training. 81-85RBM; B802-806. Finally, on February 11, 1999, Plaintiff received his engineer license. Pl. at 88; B166.

Bischak at 24; B718.  In contrast, from approximately December of 1999 to August of 2000, the starting time and location of Plaintiff's assignment was changed several times.  Pl. Decl. at ¶ 18; B32.  This was not typical for an engineer in Defendant's employ with Plaintiff's seniority level and experience.  Id.

      **b.  More Hours.**  Younger employees received more hours than Plaintiff.  Pl. at 173; B251.[28]

  On July 13, 2000, Plaintiff informed Glass that younger employees were getting a lot more hours than him.  Pl. Ans. to Interrog. No. 21, Pl. at 173-74, Pl. Decl. at ¶ 19; B74, 251-52, 32.  Glass replied, "With that big pension you get from Scott, you can afford the hours." 218p,  Pl. Ans. to Interrog. No. 21; accord Pl. at 173-74; Pl. Decl. at ¶ 19; B792, 74, 251-52, 32.

      **F.  Defendant's Age Based Animus.**

---

[28]From approximately December of 1999 to August of 2000, Plaintiff's weekly hours varied from 35 to 45 hours per week.  V. Complaint at ¶ 35; B7.  During that same nine month period, employees under age 25 and with less seniority than Plaintiff were working 50 to 60 hours per week.  Id. at ¶ 36; B7.

**1. Decisionmaker.** Tyler Glass showed age based animus toward older workers. Glass "did not want older employees to be qualified as engineers." Weikel Decl. at ¶ 21; B36. During Plaintiff's nearly three year engineer training period, "on days when there were opportunities to schedule him as an engineer trainee to get his required hours, [Glass constantly] would schedule him for a conducting job [s]o he couldn't get his [training] hours in." Weikel at 70; B438. Though Weikel himself, age 50,[29] had completed 70 of the 80 hours to qualify as an engineer, Glass told him not to go out on the railroad to complete the final 10 hours. Weikel Decl. at ¶ 21; B36.

**2. Company-wide.** Defendant has discharged, forced out, or demoted several of its employees over the age of 40. Weikel Decl. at ¶ 42; B39. Defendant was interested in hiring younger people. Pl. at 227; B305. Owner Andrew Muller, Jr., "made it known that he wanted to get rid of the older railroad employees." Weikel Decl. at ¶ 40; B38. "In the Defendant's business office at Port Clinton in 2001 or 2002, . . . Muller praise[d] younger employees and t[old] General Manager Tyler Glass and Vice President of Transportation Jim Raffa[,]" Weikel Decl. at 41.a; B38, "I will never again hire another veteran railroader. . . . [T]hey think like railroaders and not like businessmen." Weikel at 84; B452.

---

[29]This was his age at the time of Plaintiff's discharge. See Weikel at 8; B376.

After Plaintiff was fired in August of 2000, in approximately mid-2001, Signal Maintainer Thomas Hartman was fired while approximately in his early 40's, and then Assistant Superintendent Joe Abdo was forced out, while approximately in his early to mid-60's.  Weikel Decl. at ¶¶ 44, 45; B39.[30]

After Abdo was forced out, Chief Mechanical Officer Ron Mickalowski was fired in mid-2001, at age 45, and escorted off the property by a police officer.  Weikel Decl. at ¶ 46, Weikel at 88; B39, 456.  Glass and Geschwindt set up Engineer Stewart Miller to crash a locomotive at Port Clinton in order to have "an excuse to get rid of [him]." Weikel at 89; B457.  In early 2002, Miller was fired in his mid-40's, Weikel Decl. at ¶ 47; B39, and then Maintenance of Way Supervisor John Waters was forced out at age 50, Weikel Decl. at ¶ 48; B39, and replaced by Wes Westinhoffer, who was in his mid-20's.  Weikel at 101; B469.  Deljean Saylor was demoted in her early 50's.  Id.  After the younger management took over, "there was just no respect for [older employees'] amount of knowledge or abilities." Weikel at 91; B459.

**G.  Violation of Policy: Glass Allows Younger Workers to Direct Ageist Remarks to Plaintiff.**  Glass violated Defendant's Harassment policy by allowing younger workers to direct ageist remarks to Plaintiff.  The policy provides that "Any individual who is aware of . . . verbally . . . abusive [language relating to age] . . . should report such activity immediately." 177RBM; B808.  Coal Department Manager Beverly Hess and a couple of younger crew members called Plaintiff "old-timer".  Weikel at 80, 81, Weikel Decl. at ¶ 36; B448, 449, 38.

---

[30]Glass also micromanaged the Lehigh Division and usurped Joe Abdo's authority as Assistant General Manager.  Weikel at 87; B455.  Glass constantly made it unpleasant for Abdo to work.  Id.  Eventually, Abdo "just didn't want to bother with it anymore[,]" and he voluntarily left the railroad.  Id. at 87, 88; B455, 456.  When he was forced out, "Glass ran [the Lehigh Division] out of [his office in] Port Clinton . . . ." Weikel at 100; B468.

Glass knew that Plaintiff was called "old-timer", but he did nothing about it.  Weikel Decl. at ¶¶ 38-40, Weikel at 82-83; B38, 450-51.

## STANDARD OF REVIEW

  "[I]n discrimination cases, the court's role is 'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the Plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the Plaintiff.'" Lamb-Bowman, v. Delaware State Univ., 152 F.Supp.2d 553, 557-58 (D.Del. 2001)(Title VII retaliation)(citing Fed.R.Civ.P. 56(c)).  "The moving party bears the burden of proving that no genuine issue of material fact exists." Id. at 558.  "The court will 'view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion.'" Id. at 557-58.  Summary judgment is defeated "where an issue of material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility." Schoonejongen v. Curtiss-Wright Corp., 143 F.3d  120, 130 (3d Cir. 1998).

## ARGUMENT
**I.     UNDER PRONGS 1 AND 2 OF FUENTES v. PERSKIE, 32 F.3d 759 (3d Cir. 1994), PLAINTIFF HAS SUFFICIENT EVIDENCE OF PRETEXT TO GO TO THE JURY.**

  Under the three step "pretext"or "indirect evidence" framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981), the evidence demonstrates that Glass intentionally discriminated against Plaintiff because of his age by firing him.

  **A.  A Prima Facie Case Has Been Conceded by Defendant.**  Because Defendant correctly assumes for purposes of its motion that Plaintiff can establish a prima facie case, see

Def. Mem. at 7, Plaintiff's analysis of its prima facie case is set forth in the footnote below.[31]

Here, Plaintiff was 62 years old, was qualified for his job, was discharged by Tyler Glass, and was replaced by the 32 year old Jack Barnett as the engineer on the Reading Turn.  See Statement of Facts, Part III, supra.  Accordingly, Plaintiff has demonstrated his prima facie case, under our unique facts.  Jones v. School Dist. of Phila., 198 F.3d 403, 411 (3d Cir. 1999).

**B.  Defendant's Burden.**  Once Plaintiff's prima facie showing is made, "the employer [i]s obliged to proffer a nondiscriminatory reason for its adverse employment action." Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1065 (3d Cir. 1996).  The stated reason here is that Plaintiff refused to report to his assigned work location where he allegedly was needed.  Answer at ¶ 13; Glass at 38; B17, 351.  But according to Chief Dispatcher Wayne Weikel, there was no need for Plaintiff to work at Pittston on the date assigned.  See Weikel at 108; B476, and Statement of Facts, Part V.B.2 infra.  This is a genuine issue of material fact for a jury to decide.

---

[31]Under the ADEA, "[w]hen the Plaintiff alleges unlawful discharge based on age, the prima facie case requires proof that (i) the Plaintiff was a member of the protected class, i.e., was 40 years of age or older . . . , (ii) that the Plaintiff was discharged, (iii) that the Plaintiff was qualified for the job, and (iv) that the Plaintiff was replaced by a *sufficiently younger person* to create an inference of age discrimination." Showalter v. University of Pittsburgh, 190 F.3d 231, 234 (3d Cir. 1999)(emphasis added).  "In order for a Plaintiff to satisfy the sufficiently younger standard, [the Third Circuit has] noted that there is no particular age difference that must be shown, but while different courts have held that a five year age difference can be sufficient, a one year difference cannot." Id. at 236 (internal quotation marks, citations, and ellipses omitted). See also Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995).

**C. Plaintiff's Ultimate Burden.**  "[T]o defeat summary judgment when the Defendant answers the Plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the Plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764; Sheridan, 100 F.3d at 1067.  Following articulation by the Defendant of a legitimate non-discriminatory reason, a Plaintiff can proceed under either of the two prongs found in Fuentes, 32 F.3d at 764, and which were reaffirmed twice by the Third Circuit en banc in Sheridan, 100 F.3d at 1067, and in Keller v. Oriz Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)(en banc).  Under prong one, Plaintiff proceeds with a "credibility" or "unworthy of credence case."  Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997).  Here to make the case, a "Plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence."  Sheridan, 100 F.3d at 1072; Bray, 110 F.3d at 990; Keller, 130 F.3d at 1108-09.[32]

"It is the jury's determination that the reason given was pretextual together with the evidence that supported the prima facie case that will sustain a finding of intentional discrimination . . . ."  Sheridan, 100 F.3d at 1071.  "Proof that the Defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of

---

[32]"In deciding the 'ultimate question' of whether the employer unlawfully discriminated

. . . the factfinder's disbelief of the reasons put forward by the Defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination."  Sheridan, 100 F.3d at 1067 (quoting Saint Mary's Honor Ctr. v. Hicks 509 U.S. 502, 511 (1993)).  In other words, "[i]f the Plaintiff has pointed to evidence sufficiently to discredit the Defendant's proffered reasons, to survive summary judgment the Plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case."  Fuentes, 32 F.3d at 764; Sheridan, 100 F.3d at 1071.  Rather, "no additional proof of discrimination is *required*."  Hicks, 509 U.S. at 511;  Sheridan, 100 F.3d at 1066, 1071 (emphasis added).

intentional discrimination, and it may be quite persuasive."  Reeves v. Sanderson Plumbing

Products, Inc., 530 U.S. 133, 147 (2000).  The "trier of fact can reasonably infer from the falsity

of the explanation that the employer is dissembling to cover up a discriminatory purpose."  Id.

This is because "[r]esort to a pretextual explanation is, like flight from the scene of a crime,

evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct."

Sheridan, 100 F.3d at 1069.  "Thus, when all legitimate reasons for [discharging] an [employee]

have been eliminated as possible reasons for the employer's actions, it is more likely than not the

employer, who we generally assume acts only with some reason, based his decision on an

impermissible consideration . . . ."  Sheridan, 100 F.3d at 1069 (citing Furnco Constr. Corp. v.

Waters, 438 U.S. 567, 577 (1978)).

  The second prong requires evidence that "allows the fact finder to infer that discrimination was

more likely than not a motivating or determinative cause of the adverse employment action."

Fuentes, 32 F.3d at 762.[33]

---

[33]The district court's role here is limited.  "The role of determining whether the inference of
discrimination is warranted must remain within the province of the jury, because a finding of
discrimination is at bottom a determination of intent."  Sheridan, 100 F.3d at 1071.  In making
that finding, the jury must perform its traditional function of assessing the weight of the
evidence, the credibility of the witnesses through observation of both direct testimony and cross-
examination at trial, and the strength of the inferences that can be drawn from the prima facie
case and the evidence that undermines the employer's proffered reasons for its actions.  Id. at

1071-72.  This is uniquely the role of the factfinder, not the court.  <u>Id.</u> at 1072.  All the trial court must determine is "whether the Plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible . . . ." <u>Id.</u> "But once the court is satisfied that the evidence meets this threshold requirement, it may not pretermit the jury's ability to draw inferences of discrimination from the testimony, including the inference of intentional discrimination drawn from an unbelievable reason proffered by the employer."  <u>Id.</u>

**1. Prong 1 - The Weaknesses, Implausibilities, Inconsistencies, Incoherencies, or**

**Contradictions in Defendant's Case.**    On our record, (see Statement of Facts Part V above),

there are weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

Defendant's version of the case, such that a reasonable fact-finder could find it unworthy of

belief.  Fuentes, 32 F.3d at 765.  The prima facie showing, when joined with disbelief, permits

the jury to return a verdict of  discrimination.  Sheridan, 100 F.3d at 1071.

**2. Prong 2 - The Weight of the Evidence Demonstrates Age is the Reason**

**Plaintiff Was Discharged.**    There also is persuasive evidence from which the jury can conclude

that his age is the reason Plaintiff was discharged.  In summary, some examples include: 1) the

fact that Plaintiff was not discharged for identical conduct in 1999, 2) the arrival of a young

management team in mid-2000, 3) the fact that in the Summer of 2000, Plaintiff was assigned to

train his eventual replacement on the Reading Turn, an employee 30 years his junior, 4) Glass's

2000 assignment of Plaintiff to Pittston despite his ban from the entire Lehigh Division, 5) the

fact that all other engineers were at least eleven years younger than Plaintiff, 6) the lack of prior

employee criticism of Plaintiff, 7) the more favorable comparative treatment of similarly situated

younger employees, which included higher conductor pay, faster pay increases and training,

more consistent assignments and more total hours, 8) decisionmaker Glass's and company-wide

age based animus, and 9) Glass's violation of Defendant's harassment policy.  See Statement of

Facts, Part VI, supra.

**II.    DEFENDANT'S UNTIMELY MOTION SHOULD BE DENIED**

    **BECAUSE IT VIOLATES THE SCHEDULING ORDER.**

    Defendant's Motion should be denied because it violates the Scheduling Order.  The

Motion should be denied as untimely because the December 1, *2003* deadline for summary

judgment motions set by the Court in its Scheduling Order, expired over eleven months before

Defendant's Motion was filed.  On April 11, 2003, the Court ordered that "[a]ll motions for

summary judgment or partial summary judgment shall be filed and served on or before Monday,

December 1, 2003." Scheduling Order at ¶ 3; B25.  The Amended Scheduling Order of

November 1, 2004, set forth a new date for "[a]ll non-dispositive motions" but did not amend the 2003 deadline for summary judgment motions.  Amended Scheduling Order at ¶ 1; B29.

Also, Defendant did not provide a short and concise statement in numbered paragraphs of material facts to which it contends there is no genuine issue of material fact.  "Failure to submit such a statement of material facts with citations may constitute ground for denial of the motion."  Scheduling Order at ¶ 4; B25.  Defendant's failure has made it impossible for Plaintiff to respond with a similarly short and concise statement in response as envisioned under the Scheduling Order.  Therefore, Defendant's Motion for Summary Judgment should be denied.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

**LAW OFFICE OF JOHN M. LaROSA**

 /s/ John M. LaRosa
**JOHN M. LaROSA, ESQUIRE**
Pa. S.C. No. 85339
Two East 7th Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290
JohnMLaRosa@Earthlink.net

| | |
|---|---|
| **THE NEUBERGER FIRM, P.A.** | **RALPH E. LAMAR, IV ATTORNEY AT LAW** |
| **THOMAS S. NEUBERGER, ESQUIRE** | **RALPH E. LAMAR, IV, ESQUIRE** |
| Two East Seventh Street, Suite 302 | 141 Spruce Lane |
| Wilmington, DE 19801-3707 | Collegeville, PA 19426 |
| Delaware Bar No. 243 | Pa. S.C. No. 78974 |
| (302) 655-0582 | (610) 831-5181 |
| TSN@ NeubergerLaw.com | Ralph.Lamar@Verizon.Net |

Dated: December 20, 2004                Attorneys for Plaintiff John M. Nolan, Jr.

Attorney Files/John's Files/Client Files/JLR Clients/Nolan/Pleadings/Summary Judgment Answering Brief

## CERTIFICATE OF SERVICE

I, John M. LaRosa, being a member of the Bar of this Court, do hereby certify that on December 20, 2004, I caused two (2) copies of the foregoing **PLAINTIFF'S ANSWERING BRIEF IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** and one (1) copy of the appendix thereto to be sent via first class U.S. mail, postage prepaid to the following:

> Robert G. Devine, Esquire
> Michael W. Horner, Esquire
> White and Williams LLP
> 1800 One Liberty Place
> Philadelphia, PA 19103
>
> Paul R. Ober, Esquire
> Paul R. Ober & Associates
> 234 North 6th Street
> Reading, PA 19601

> **LAW OFFICE OF JOHN M. LaROSA**

> _____ /s/ John M. LaRosa
> **JOHN M. LaROSA, ESQUIRE**
> Pa. S.C. No. 85339
> Two East 7th Street, Suite 302
> Wilmington, Delaware 19801
> (302) 888-1290
> JohnMLaRosa@Earthlink.net

> Attorney for Plaintiff John M. Nolan, Jr.

cc:    Ralph V. Lamar, IV, Esquire
       Thomas S. Neuberger, Esquire

       Mr. John M. Nolan, Jr.